**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| L.M., an individual,<br><br>                 Plaintiff,<br><br>      v.<br><br>G6 HOSPITALITY, LLC, G6 HOSPITALITY<br>FRANCHISING, LLC and<br>WYNDHAM HOTELS & RESORTS, INC.<br><br>                 Defendants. | Case No. _____<br><br>**JUDGE** _____<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

COMES NOW, the Plaintiff ("Plaintiff" or "L.M."), by and through her undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1. Plaintiff is a survivor of human sex trafficking.

2. Plaintiff's life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

3. At the time her trafficking began, Plaintiff had run away from Foster Care at the age of 14. L.M.'s foster parents did not allow her to return home. L.M. was living on the streets and that is where she met her traffickers. L.M. had no place to go and the traffickers offered her a place to stay. Ultimately her traffickers came to control every aspect of her life. The defining factor of the relationship between Plaintiff and her traffickers, was that each night, Plaintiff's traffickers forced her to have sex with men for money.

4. Plaintiff was trafficked in hotels owned by Defendants Wyndham Hotels & Resorts, Inc. ("Wyndham" or "Corporate Brand Hotel Defendant")and G6 Hospitality, LLC ("G6" or

1

Corporate Brand Hotel Defendant")(known together as the "Defendants" or "Corporate Brand Hotel Defendants") Plaintiff's trafficker rented hotel rooms for one purpose—a location to engage in sex trafficking.

5.      At the Defendants' hotels, Plaintiff forced to engage in sex with many men every day. Every new customer was another instance Plaintiff was forced to have sex against her will—that is to say, Plaintiff was raped multiple times per day by multiple men when she stayed at Defendants' hotels.

6.      Plaintiff's traffickers forced her onto the Defendants' property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

7.      At some point, Plaintiff was able to escape the grasps of her traffickers and the prison of the Defendants' hotel rooms.

8.      Plaintiff has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of her trafficking.

9.      Plaintiff brings this lawsuit in an attempt to hold the Defendants accountable for their role in her trafficking.

**OVERVIEW OF TRAFFICKING**

10.      For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from their trafficking occurring on their properties.

11.      The relationship between a pimp and a prostitute is inherently coercive, and the

2

United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[1] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

12.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[2]

13.     The Defendants knew and have known for decades that they profit from sex trafficking repeatedly occurring under their brand flags. Rather than taking timely and effective measures to stop profiting from this epidemic, the Defendants choose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented and Wi-Fi provided for this explicit and apparent purpose.

14.     The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[3] However, traffickers aren't the only profiteers. The hotel industry, including the Defendants, makes millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex acts.

---

[1] See, e.g., A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; Prostitution and Trafficking in Women: An Intimate Relationship, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women intimate-relationship.

[2] *Id.*

[3] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

Defendants and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

15.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Defendants knew or should have known regarding the trafficking of Plaintiff at the Defendants' Hotel.

16.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[4] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[5] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[6] Hotels have been found to account for over 90 percent of commercial exploitation of children.[7]

17.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[8]

18.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and

---

[4] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-traffickingusslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere."

[5] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[6] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wpcontent/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[7] Erika R. George & Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[8] See, e.g., Department of Homeland Security, Blue Campaign Toolkit, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf;  National Center for Missing & Exploited Children, Child Sex Trafficking Overview, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, Red Flags for Hotel and Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www.2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[9]

19. Widely recognized signs of sex trafficking, which can be observed by hotel staff all which defendants were made of aware of, include but are not limited to:

   a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

   b. Individuals show signs of physical abuse, restraint, and/or confinement;

   c. Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

   d. Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

   e. Individuals lack freedom of movement or are constantly monitored;

   f. Individuals avoid eye contact and interaction with others;

   g. Individuals have no control or possession of money or ID;

   h. Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

   i. Individuals have few or no personal items – such as no luggage or other bags;

   j. Individuals appear to be with significantly older "boyfriend" or in the company of older males;

---

[9] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, Red Flags for Hotel & Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, Human Trafficking Red Flags, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

k. A group of girls appear to be traveling with an older female or male;

l. A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m. Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n. Possession of bulk sexual paraphernalia such as condoms or lubricant;

o. Possession or use of multiple cell phones; and

p. Possession or usage of large amounts of cash or pre-paid cards.[10]

20. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[11] From check-in to check-out, there are indicators that traffickers and their victims exhibit during their stay at the hotel.

21. The Defendants and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Defendants' own properties. The Defendants and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project created for the use of the hospitality industry.

22. The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by the Defendants and the rest of

_____

[10] *Id.*
[11] Department of Homeland Security, Blue Campaign Toolkit,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

6

the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that the Defendants and all industry participants continue to profit millions from participating in a venture in violation of § 1591(a).

23. The Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of Plaintiff on their properties.

24. Plaintiff is a survivor of sex trafficking. Key findings from the Polaris Project are that "survivors of human trafficking are not thriving. The systems that were supposed to protect them before, during and after their human trafficking situations failed and failed miserably. Systems such as child welfare, criminal justice and legal systems — failed." https://polarisproject.org/national-survivor-study/

25. Plaintiff looks to the judicial system, who has been empowered by Congress to provide a remedy to Victim-Survivors pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595 and Child Abuse Victim's Rights Act, 18 U.S.C. § 2255. Each Defendant, knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1591(a).

**PARTIES**

26. Plaintiff is a natural person and a resident and citizen of Columbus, Ohio.

27. Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

    a. Due to the sensitive and intimate nature of the issues, Plaintiff requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and

after.[12]

b. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[13] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[14] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[15]

c. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[16]

e. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims

---

[12] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[13] Fed. R. Civ. P. 10(a).

[14] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[15] Fed. R. Civ. P. 26(c).

[16] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

28.     **Defendant Wyndham Hotel & Resorts, Inc.** ("Wyndham") is a large hotel brand with nearly 9,000 branded properties worldwide. Wyndham is a Delaware corporation with its principal place of business in Parsippany, NJ.

29.     Wyndham maintains a registered agent in Ohio, and it can be served through its registered agent, Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, OH 45202.

30.     Wyndham is the successor entity to Wyndham Worldwide Corporation and retains successor liability for the wrongful acts of its predecessor. Where applicable, references to Wyndham in this Complaint refer also to Wyndham Worldwide Corporation.

31.     Wyndham owns, supervises, manages, controls, and/or operates the La Quinta Inn and Suites, located at 30847 Flynn Dr, Romulus, MI 48174 ("Romulus La Quinta.")

a. Wyndham branded properties and will be referred to herein as "Branded Properties or Property."[17]

b. Wyndham employees worked throughout the Branded Properties. Wyndham employees worked jobs including front desk and housekeeping. Wyndham is the principal with control over nearly every element of operations at the Branded Properties. Wyndham is liable, either directly, vicariously, or indirectly through an agency relationship for acts and/or omissions of the employees at its branded

---

[17] *Our Brands,* Wyndham Hotels, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited September 27, 2022).

hotels, including the Wyndham Branded Properties where Plaintiff was trafficked. Wyndham has an actual and apparent agency relationship with the physical property owners of the Wyndham Branded Properties to establish vicarious liability.

c. Wyndham controlled and dictated the actions and inactions of the Branded Properties through highly specific and detailed brand standards, policies, and procedures.

d. Wyndham knowingly benefited, or received something of value, from its ventures at the Branded Properties through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where Plaintiff was trafficked, as well as in maintaining a positive public image for the Wyndham Branded Properties. Wyndham also benefited from gathering personal data from the Wi-Fi it provided to customers including Plaintiff and her trafficker.

e. Wyndham is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. Wyndham has derived substantial revenue from services rendered in Ohio.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of Wyndham, the allegation is that Wyndham engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Wyndham.

32. **Defendant G6 Hospitality, LLC** ("G6") is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees. The company also provides franchise opportunities for its hotel and motel brands through **G6 Hospitality Franchising, LLC**[18].

33. G6 is a Delaware corporation with its headquarters in Carrollton, TX.

34. G6 maintains a registered agent in Ohio, and it can be served through its registered agent, Cogency Global, Inc., 3958-D Brown Park Dr, Hilliard, OH 43026.

35. Motel 6 by G6 is classified as a value brand hotel.[19]

36. G6 owns, supervises, manages, controls, and/or operates the Motel 6 located at, 2380 W Northwest Hwy, Dallas, TX 75220 ("Dallas Motel 6.")

    a. The Dallas Motel 6 is a G6 branded property and will be referred to herein as a "Branded Property."

    b. G6 employees work throughout the Branded Property by G6. G6 employees work jobs including front desk and housekeeping. G6 is the principal with control over nearly every element of operations at the Branded Property by G6. G6 is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the G6 Branded Property by G6 where Plaintiff was trafficked. G6 has an actual and apparent agency relationship with the

---

18 Upon information and belief, G6 Hospitality, LLC in turn owns and controls G6 Hospitality Franchising, LLC through a series of wholly owned financing subsidiaries. Defendants G6 Hospitality, LLC and G6 Hospitality Franchising, LLC will be collectively referred to as "G6".

19 *Motel 6 – An Iconic American Brand,* G6 HOSPITALITY, https://g6hospitality.com/our-brands/

physical property owner of the Branded Property by G6 to establish vicarious liability.

c.    G6 controlled and dictated the actions and inactions of the Branded Property by G6 through highly specific and detailed brand standards, policies, and procedures.

d.    G6 knowingly benefited, or received something of value, from its commercial business venture at the Branded Property by G6 through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where Plaintiff was trafficked, as well as in maintaining a positive public image for the Motel 6 brand.

e.    G6 is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, such as the Branded Property by G6, contracting to supply services in Ohio. G6 has derived substantial revenue from services rendered in Ohio, has caused injuries to Plaintiff in Ohio and profited from a commercial business venture which unlawfully permitted criminals to sell Plaintiff for commercial sex at the G6 Branded Property by G6 in Ohio.

f.    Whenever reference is made in this Complaint to any act, deed, or conduct of G6, the allegation is that G6 engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of G6.

12

## JURISDICTION AND VENUE

37.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

38.     The Court has personal jurisdiction pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") and 18 U.S.C. § 2255, Child Abuse Victims' Rights Act ("CAVRA").

## FACTUAL BACKGROUND

### INTRODUCTION

39.     Plaintiff brings her claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a) and the Child Abuse Victim's Rights Act ("CAVRA"), 18 U.S.C. § 2255.

40.     The TVPRA prohibits Defendants from profiting from any venture they know or should know involves a violation of § 1591, and thereby establishes a non-delegable duty of reasonable care.

41.     An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[20] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues for sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Defendants' Wi-Fi to advertise and solicit victims for commercial sex against their will.

42.     As part of their conspiracy, to save costs and continually reap millions of dollars in profits, Defendants generally failed to create, adopt, implement, and enforce company-wide

---

[20] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

policies and procedures regarding suspected incidents of human trafficking at the branded properties—despite the general knowledge in the industry and their own corporate records that human sex trafficking was happening in the hotel industry and in their branded properties. Furthermore, Defendants, did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

43.     Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Defendants did not establish a mandatory and secure reporting mechanisms at the point of sale.

44.     Despite the proven ability to respond to important societal issues such as COVID-19 by modifying the brand standards to keep guests safe, Defendants did nothing in the face of the human sex trafficking epidemic in their industry.  Instead, they continued to profit from the rental of rooms that they knew or should have known were rented and used for the purpose of sex trafficking.

45.     Defendants thus failed to act to ensure that it did not benefit from the human sex trafficking occurring at its branded properties. Defendants failed to implement appropriate policies and procedures that a reasonably diligent corporation would or should have implemented so that it would not continue to benefit from the human trafficking occurring at their branded properties.

46.     With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like Plaintiff to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties while Defendants reap the benefits.

47.     Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are

14

the result of continued instances of ongoing violent traumatizing sexual exploitation.

48.     Plaintiffs' injuries are almost exclusively mental, emotional, and psychological in nature and derive from the trafficking period.  A trafficking period is ongoing and continuous and resulting injuries cannot be divided; thereby subjecting the hotel defendants to joint and several liability. Federal common law provides for joint and several liability for indivisible injuries, such as those suffered by Plaintiff.

49.     Plaintiffs' injuries—particularly Plaintiff's ongoing mental, emotional, and psychological injuries—have no reasonable basis on which to determine the relative contribution of a particular defendant conduct to the single harm.

50.     Violators of Section 1595 of the TVPRA are jointly and severally liable for a victim's damages. Victims are entitled to all compensatory and non-compensatory damages incurred during their trafficking period. 18 U.S.C. §1595(a).  Thus, Defendants are jointly and severally liable for the Plaintiff's damages in this case.

## THE SEX TRAFFICKING OF PLAINTIFF

51.     Plaintiff met her trafficker when she was just [Age Of Plaintiff] years old.

52.     By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing. Plaintiff was held captive and sold for sex by her traffickers.

53.     During the time that she was trafficked, Plaintiff's traffickers frequently rented rooms at the Defendants' hotel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with Plaintiff.

54.     Throughout her trafficking, Plaintiff's traffickers connected with "johns" by

15

posting or causing to be posted advertisements on List Crawler and Mega Personals advertising for L.M.'s availability for commercial sex. L.M.'s traffickers posted many of these advertisements and had conversations with "johns" while connected to Defendants' Wi-Fi.

55.     Plaintiff was forced to have sex with multiple "johns" every day she was trafficked in the Defendants' hotels.

56.     From approximately 2019 to 2022, while under the coercive control of trafficker, Plaintiff was imprisoned in hotel rooms rented by her traffickers and forced her to have sex for money. During that time, Plaintiff was trafficked in the above-named Branded Hotels.

57.     During the time she was trafficked, Plaintiff's traffickers constantly shuffled her back and forth among hotels, often visiting the same hotels repeatedly at intervals.

58.     While at the Defendants' hotels, Plaintiff's traffickers violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape.

59.     During her captivity at Defendants' hotels, Plaintiff was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned in the Defendants' brand hotels listed above.

60.     At the above listed hotels, Plaintiff encountered the same staff on multiple occasions. The Defendants' staff would have seen the signs of Plaintiff's deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of the Defendants' properties as well as signs of malnutrition and poor health.

61.     Every time Plaintiff interacted with the Defendants' staff, it was readily apparent that Plaintiff was under the control of her traffickers. Plaintiff's traffickers, who were significantly

older than Plaintiff, checked in to the Defendants' hotels using their own names.

62.     Plaintiff's traffickers followed a repetitive and routine procedure during stays at the Defendants' hotels and the Defendants' hotels knew or should have known of Plaintiff's trafficking because of a variety of factors detailed below:

### THE SEX TRAFFICKING OF PLAINTIFF AT THE WYNDHAM BRANDED PROPERTY

63.     Plaintiff was subjected to sex trafficking at the Wyndham Branded Properties.

64.     Plaintiff and her traffickers rotated stays between the Branded Properties from approximately 2020 to 2021, frequently staying days at a time, encountering the same staff. Plaintiff's traffickers were very violent with her here, and loud sounds of abuse could often be heard from the room.

65.     At the Branded Properties there was constant foot traffic in and out of Plaintiff's room. At all hours of the day and the night, the staff witnessed "johns" – who were significantly older than Plaintiff – come into the main entrance and to Plaintiff's room. The staff also had access to security camera footage documenting the constant stream of buyers from cameras placed in throughout the hotel.

66.     Plaintiff's traffickers were very violent with her at the Branded Properties and would often abuse L.M. in public areas of the hotels.

67.     Further, with each stay at the Branded Properties by Wyndham, it resulted in several consistent red flags, potentially including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Requesting a room away from other guests; Unusually large number of used condoms in the trash; Unusually large number of male visitors coming in and out of the room; Asking the front desk not to be disturbed; Women wearing clothing inappropriate for

17

the weather; Loitering or Soliciting on hotel grounds; and living out of the hotel room.

68.     Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at the Brice Road Days Inn and Clara Street Days Inn by Wyndham.

69.     These red flags were open and obvious to anyone working at the Romulus La Quinta by Wyndham.

**THE SEX TRAFFICKING OF PLAINTIFF AT THE G6 BRANDED PROPERTY**

70.     Plaintiff was subjected to sex trafficking at the G6 branded Dallas Motel 6 located at 2380 W Northwest Hwy, Dallas, TX 75220.

71.     Plaintiff and her traffickers stayed at the Branded Property in 2022, frequently staying for weeks at a time, encountering the same staff, within this period.

72.     Plaintiff's traffickers were very violent with her at the Branded Property and would often abuse L.M. in public areas of the hotel.

73.     At the Branded Property, Plaintiff had tried to escape her trafficker. L.M.'s trafficker grabbed her and dragged her back to his car. Furthermore, L.M. and her trafficker got into mutiple physical altercations at the branded property. Some of these altercations occurred in a public area of the hotel which would have been visible to hotel staff.  The foot traffic was also accessible to staff via footage from security cameras placed throughout the hotel.

74.     Further, with each stay at the Branded Property, several consistent red flags were likely apparent, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Requesting a room away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large number of used condoms in the trash; Visible signs of prior and private physical abuse; Unusually large number of male visitors coming in and out of the room; Asking the front desk not to be disturbed; Women wearing clothing

inappropriate for the weather; and Loitering and soliciting on hotel grounds.

75.     Plaintiff was repeatedly raped and otherwise sexually abused at the Branded Property.

76.     These red flags were open and obvious to anyone working at the Branded Property.

## DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR LOCATIONS

77.     Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[21] The United Nations,[22] international non-profits,[23] and the U.S. Department of Homeland Security,[24] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

78.     For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and

---

[21] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[22] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[23] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[24] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

79.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[25] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[26] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

80.     The Defendants, on information and belief, have access to individual hotel location do-not-rent lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. The Defendants nevertheless do not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

81.     The Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

82.     The Defendants have access to reviews left by guests on websites such as

---

[25]     *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heino us%20crime.
[26] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

83.     A brief examination of just a handful of examples for each Defendant suffices to show the extraordinary frequency with which the Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations:

**WYNDHAM**

84.     Defendant Wyndham knew and communicated to franchises and hotel management that trafficking was often associated with other criminal activity, including drugs and assaults.

85.     Countless tales of tragedy, which upon information and belief Wyndham knows about, establish the entrenched and pervasive nature of Wyndham's role in providing a venue where sex trafficking has continued, unabated, for years. For example, reviews of its branded properties, which upon information and belief Wyndham monitors regularly, also show the pervasiveness of sex trafficking at its branded properties and Wyndham's knowledge of the same.

86.     Wyndham has access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations.

87.     Wyndham has access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

88.     Information that has become public through news stories establishes the entrenched and pervasive nature of Wyndham's role in providing a venue where sex trafficking has continued unabated for years.

89.     At the time Plaintiff was trafficked at the subject properties, the Defendants knew

21

or should have known that:

    a. There was widespread and ongoing sex trafficking occurring at the Branded properties.

    b. Sex trafficking was a brand-wide problem for the Corporate Brand Hotel Defendant originating from management level decisions at their corporate offices.

    c. The Corporate Brand Hotel Defendant's franchisees and hotel staff were not taking reasonable steps to identify and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

    d. The Corporate Brand Hotel Defendant's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.

    e. The Corporate Brand Hotel Defendant and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

90.    Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, the Corporate Brand Hotel Defendant continued to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

### G6 HOSPITALITY

91.    Defendants knew and communicated to franchises and hotel management that trafficking was often associated with other criminal activity, including drugs and assaults.

92.    Countless tales of tragedy, which upon information and belief the Corporate Brand Hotel Defendant knows about, establish the entrenched and pervasive nature of G6's role in

providing a venue where sex trafficking has continued, unabated, for years. For example, reviews of its branded properties, which upon information and belief G6 monitors regularly, also show the pervasiveness of sex trafficking at its branded properties and G6's knowledge of the same.

93. G6 has access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations.

94. G6 has access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

95. A brief examination of just a handful of examples for Motel 6 by G6 suffices to show the extraordinary frequency with which G6 has long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations.

   a. Regarding an August 2014 stay at the Dallas Motel 6 by G6, a hotel customer wrote a review saying, "Bugs, cops and hookers. This motel needs to be shut down. It has not been updated in years. Mold around the window with one of the loudest ac units I have ever heard. Holes in the wall and carpet and this was our second room."

58. Information that has become public through news stories establishes the entrenched and pervasive nature of G6's role in providing a venue where sex trafficking has continued unabated for years. G6 monitored news stories and online reviews for indicia of criminal activity at their branded locations, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at G6 hotels:

- In late 2003, a traffickers set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten times per day.[27]

- In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[28]

- In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[29]

- From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[39]

- In January 2012, a couple was charged with prostitution and pimping at a Studio 6 in Roswell, GA.[30]

- Police rescued an eighteen (18) year old girl from a sex traffickers in February 2012, at a Motel 6 in Portland, Oregon.[31]

- In July 2012, a man was accused of trafficking young girls in foster care for sex. The girls often met customers at a Studio 6 in Jacksonville, Florida.[32]

- In August 2012 a person was charged with prostitution at a Studio 6 in Mentor, Ohio.[33]

---

[27] Amy Fine Collins, *Sex Trafficking of Americans: The Girls Next Door,* Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105.

[28] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

[29] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html [39] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download.

[30] Couple arrested for pimping, prostitution, Appen Media (Jan. 17, 2012), https://www.appenmedia.com/public_safety/couple-arrested-for-pimping-prostitution/article_473fe798-1b3d-5c6fb230-547e3e5c4651.html.

[31] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex- trafficking-two-victims.

[32] *Feds: Man recruited foster care girls for prostitution*, News4Jax (July 6, 2012), https://www.news4jax.com/news/2012/07/07/feds-man-recruited-foster-care-girls-for-prostitution/.

[33] Mentor Police: Prostitute Ran Massage Parlor at Hotel, Fox8 (Aug. 3, 2012), https://fox8.com/news/mentorpolice-say-prostitute-ran-make-shift-massage-parlor-at-hotel/.

- The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[34]

- The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[45]

- In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[35]

- Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[47]

- In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women.[48]

- Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota.[49]

- In May 2014, two (2) traffickers were arrested at a Motel 6 in Monterey, California after a twenty-one (21) year old woman escaped from their captivity.[36]

- In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex traffickers and trafficked out of a Motel 6 in Cutler Bay, Florida.[37]

---

[34] *FBI Investigates Human Trafficking At Madison Hotel,* WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.  [45] *Suspects Busted in Anaheim Sex Ring,* ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

[35] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex- traffickers-inhumanity/.  [47] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.  [48] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.  [49] Man, 25, Is Accused Of Trafficking Teens, Twin Cities Pioneer Press (Jun. 5, 2014), https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/

[36] Felix Cortez and Amy Larson, Monterey Police: 2 Human Sex Traffickers Arrested After Victim Escapes Motel, KSBW8 (May 9, 2014), https://ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-aftervictim-escapes-motel/1054172.

[37] David Goodhue, Next Stop For Man Accused Of Sex Trafficking 2 Teens: Federal Court, Miami Herald (Sept. 2, 2015), https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html.

- A Las Vegas man was charged with sex trafficking two (2) victims, including a seventeen (17) year old girl, in January 2015, out of a Motel 6 in Rapid City, Nevada.[38]

- In February 2015, two (2) men were arrested for sex trafficking a fourteen (14) year old girl at a Motel 6 in Seekonk, Rhode Island.[39]

- A local law enforcement investigation resulted in the rescue of a fifteen (15) year old runaway in February 2015, from a Motel 6 near the Oakland, California airport where she was being sex trafficked.[40]

- In North Charleston, South Carolina, a seventeen (17) year old girl was rescued in March 2015 from a Motel 6 by special agents from the United States Department of Homeland Security. The girl was sold for sex, beaten, and starved by a sex trafficker.[41]

- Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[42]

- In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[43]

- Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[44]

---

[38] Las Vegas Man Charged With Human Trafficking In Rapid City, Argus Leader (Jan. 17, 2015), https://www.argusleader.com/story/news/crime/2015/01/17/las-vegas-man-charged-human-trafficking-rapid22city/21922915/.

[39] Stephen Peterson, RI Man Gets Jail In Sex-Trafficking Case Involving Seekonk Motel (Oct. 28, 2016), http://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-case-involvingseekonk/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html.

[40] Emilie Raguso, Woman Charged In Berkeley Teen Sex Trafficking Case (Dec. 8, 2015), https://www.berkeleyside.com/2015/12/08/woman-charged-in-berkeley-teen-sex-trafficking-case.

[41] Melissa Boughton, Police Say Teen Starved, Beaten at North Charleston Hotel; Man Arrested in Sex-Trafficking Case (Mar.2, 2015), https://www.poastandcourier.com/archives/police-say-teen-starved-beaten-at-north-charlestonmotel-man/article_032153eefcb6-5333-9182-926a7f43dfbf.html.

[42] Lindsay Bramson, Local Teen Saved from Sex Slavery; Two Charged, KXAN Austin (Mar. 6, 2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.

[43] Amanda Milkovits, Massachusetts Man Accused Of Trafficking Teen In Warwick Motel, NewportRI.com (Mar. 24, 2015), https://www.newportri.com/article/20150324/NEWS/150329666.

[44] Sarah Kaplan, Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List To Police, The Washington Post (Apr. 28, 2015),https://www.washingpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-handover-guest-list-to-police/?utm_term=.a804ce3f32a8.

- Seven (7) people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6.[45]

- In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls, Montana where she was involved in sex trafficking a seventeen (17) year old girl.[60]
- A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[46]

- In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[47]

59. These articles are only limited representative examples. There are many similar articles about sex trafficking and other associated criminal activity at G6 branded hotels. Moreover, according to information and belief, the G6 Defendants are aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media. Ultimately, several hundred of traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of G6 branded properties.

60. Reviews of G6 branded properties, which upon information and belief, each of G6, monitored regularly, also show both the pervasiveness of sex trafficking at G6 properties and G6's knowledge of the same. For example:

---

[45] Hsing Tseng, Seven Indicted By Colorado Grand Jury In Child Sex Trafficking Ring Bust, Fox 31 Denver (Jan. 6, 2016), https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex- trafficking-ring-bust/. [60] Andrea Fisher, Woman Caught Up In Human Trafficking Ring Pleads Guilty (Aug. 29, 2016), https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleadsguilty/89566374/. https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleadsguilty/89566374/.

[46] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, HeraldNet (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/. https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[47] Tuscaloosa Man Charged With Rape And Trafficking Mississippi Teen, NewsMississippi (Nov. 7, 28 2014), https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/. https://newsms.fm/tuscaloosa-mancharged-human-trafficking-mississippi-teen/.

a. 2010 TripAdvisor review out of Maine states "[M]y tour group and I figured that we should just stay here considering we were only staying here one night...There was dirtbags hanging around the pool area, and in the little yard area on the side. It looked as if all of the people who LIVED THERE were on drugs by the way they talked! Also during my stay there we saw a prostitute who must have been living there! She looked anorexic and came into the lobby telling the receptions that the cops might be coming so tell her if they show up! (i am not making any of this up) there was also "a security guard" there waiting in the lobby all day and throughout the night making sure that the prostitute did not leave. They told the receptionist that the prostitute had 2 clients upstairs..."[48]

b. 2011 Yelp review in California states "…We paid to spend two night, but after one night of being terrorized by pimps, prostitutes, "druggies" and homeless sleeping in cars we checked out…Our lasting memory should be the beautiful wedding, but instead it will be know as our night of terror. The management is well aware of this and contribute to the problem by renting rooms to these terrorist..."[49]

c. 2011 TripAdvisor review from California states "…After watching the pedestrian and vehicle traffic for a period of time in the immediate area, it is apparent that the staff does not decline service to prostitutes w/ their protection (pimps) and drug dealers...While the affordable rates are the draw, once your there, you'll realize that Corporate hasn't paid attention to what occurs there or doesn't care as long as the money keeps coming in."[50]

d. 2011 Yelp review from California states "Sheets and towels are frequently stained. Prostitution is a problem at this location, leading me to believe management and the staff (who are very friendly with the hookers) turns a blind eye to it to fill rooms or is being paid to look the other way…"[51]

e. 2012 TripAdvisor review from Colorado states "…The first night, I received phone call after phone call, asking if I wanted "sexual favors" done to me. NO!!!!!! I also witnessed numerous drug dealings going on, and had my door banged on several times…Upon checkout, I explained issues to the clerk (the same person who checked me in) and she said, oh well…"[52]

---

[48] https://www.tripadvisor.com/Hotel_Review-g41519-d244102-Reviews-Motel_6_Boston_North_Danver[PL INITIALS]anvers_Massachusetts.html

[49] https://www.yelp.com/biz/motel-6-santa-rosa-south-santa-rosa

[50] https://www.tripadvisor.com/Hotel_Review-g32810-d78752-Reviews-Motel_6_Oakland_AirportOakland_California.html

[51] https://www.yelp.com/biz/motel-6-salinas

[52] https://www.tripadvisor.com/Hotel_Review-g33388-d83061-ReviewsMotel_6_Denver_Central_Federal_Boulevard-Denver_Colorado.html

28

f. 2012 Yelp review out of Texas states "Do not stay here. Just stayed here and had some shadey stuff goin on…for one the hotel is a front for a prostitution ring the owners are running…I turned down one of the girls who in which called my room phone and asked if I wanted company and soon after had one with purple hair and what looked like her pimp at my door. I didn't answer I just watched through the peep hole. after they knocked for about 5 mins they left. As soon as I got comfortable I hear someone messing with my door and I look through the peep hole and they are back and are trying to use a key.. woooow..."[53]

g. 2012 Yelp review from California states "what to say about the "no tell motel sex" lol sad but true...my neighboor had people as in men in and out all night long if you get my drift, and when i called the front desk they said they would check it out and never did…"[54]

h. 2012 TripAdvisor review out of Illinois states "I have recently been relocated with my job out here so looking for a place in glenview area. I stood here for a week. They had pimps and prostitution going on next door, under and across from me my whole week hear. I told front desk of the noise and loud banging they were making all day and night long. The front desk called one room where they were in the prostitute got rude with her you can hear it they were told to check out but the same day they checked back in next door to me. Staff here must be in on it some how cause I watched a pimp and a few under age girls go in and out a few rooms across and next to me all night long with custermers. The following morning around 5am I was woken to a girl in the hall yelling at the pimp who just hit her. It gets better I guess staff told them I made a complaint so then after they were banging on my door and getting rooms next to me as well making extreme noise so they can get me out..."[55]

i. 2013 TripAdvisor review from New York states "If you like drugs and drug addicts and drug dealing and prostitutes, this is the place to go. Not only do these people live in the hotel and use it as a place of business, but some of the staff is involved in drug dealing as well…"[56]

j. 2013 TripAdvisor review from Tennessee states "Two different rooms within sight of my room had prostitutes working out of them, one with an amazingly loud and foul-mouthed guy. I was tailed by a drug dealer who seemed to be concerned that I was competition and once he determined that I wasn't, he

---

[53] https://www.yelp.com/biz/motel-6-dallas-4
[54] https://www.yelp.com/biz/motel-6-escondido?start=60
[55] https://www.tripadvisor.com/Hotel_Review-g36052-d243950-Reviews-Motel_6_Chicago_North_GlenviewGlenview_Illinois.html
[56] https://www.tripadvisor.co.nz/Hotel_Review-g29810-d93070-r172297063-Motel_6_Amherst_NY_BuffaloAmherst_New_York.html

disappeared. There are obviously semi-permanent residents there. . . . To the management who will undoubtedly respond to this review with some sort of vague platitudes about being happy to hear comments from their guests: Save your typing fingers. It's pretty clear that you INTEND to operate your property like this. Your property is unsafe, unsanitary, and you are doing NOTHING to prevent it."[57]

k.  2013 Yelp review from California states: "If you want drugs, hookers, tweekers, dope heads, and shitty service this is your place. I wish the police would shut this place down. This is a great neighborhood but this place draws the worst people I have ever seen. I don't get how the police havent shut this place down. Police should be warned and concerned about this horrible establishment!!! do not bother with this horrid location."[58]

l.  2013 TripAdvisor review from Illinois states: "I have recently been relocated with my job out here so looking for a place in glenview area.I stood here for a week. They had pimps and prostitution going on next door, under and across from me my whole week hear. I told front desk of the noise and loud banging they were making all day and night long. The front desk called one room where they were in the prostitute got rude with her you can hear it they were told to check out but the same day they checked back in next door to me.Staff here must be in on it some how cause I watched a pimp and a few under age girls go in and out a few rooms across and next to me all night long with custermers. The following morning around 5am I was woken to a girl in the hall yelling at the pimp who just hit her. It gets better I guess staff told them I made a complaint so then after they were banging on my door and getting rooms next to me as well making extreme noise so they can get me out. Also they were also throwing rocks late night at my windows. This place is more like a homeless shelter but you pay for it!!! They have cams in the hallways but obviously they dont watch them or they dont work or care!!!! Stay away if you are smart!!!!"[59]

m.  2014 Expedia review from Texas states: "We only stayed one of two nights since I refused to stay another night with my daughter in what seemed like a brothel. For starters, there are some very sleazy low lifes that stand by the side doors making it very intimidating to enter. They would let in scantily clad women wearing wigs and other sleazy looking people who I assumed were the "johns". I also saw what looked like drug deals taking place. When I would use

---

[57] https://www.tripadvisor.com/Hotel_Review-g55229-d98206-Reviews-Motel_6_Nashville-Nashville_Davidson_County_Tennessee.html

[58] https://www.yelp.com/biz/motel-6-sacramento-sacramento

[59] https://www.tripadvisor.com/Hotel_Review-g36052-d243950-Reviews-Motel_6_Chicago_North_GlenviewGlenview_Illinois.html

the side door, there was always some guy that would try to get in although it was obvious they weren't staying there."[60]

n.  2014 TripAdvisor review from Louisiana states: "had $500 stolen from my room, elevator stunk of marijuana and my friend was offered a prostitute by what must have been an organised ring at the hotel that the staff were happily working with! No refund offered when I was there even when I E-mailed the Motel 6 when I got home they obviously didnt care as they never got back to me, just awful"[61]

o.  2014 review from Georgia states: "I don't know why Motel 6 management has allowed this one to be taken over by creeps, but it has. This place will not give you a good night sleep with the all night drug deals and hookers yelling, slamming doors, and dogs barking (yes, dogs barking!). ...Seriously, it ain't safe and it needs to be shut down by the city. DON'T GO HERE!!!!!"[62]

61.  These reviews are limited representative examples. There are many similar online reviews for G6 branded hotels, and, on information and belief.

62.  News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time Plaintiff was trafficked at the Subject Motel 6s, G6 knew or should have known:

a.  The use of G6 branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

b.  Commercial sex work occurring at G6 branded properties involved trafficking and compelled prostitution;

c.  G6 Franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at G6 hotel properties;

d.  Their efforts, if any, to stop facilitating sex trafficking in G6 branded properties were not effective; and

---

[60] https://www.expedia.com/Dallas-Hotels-Motel-6-Dallas.h73785.Hotel-Reviews
[61] https://www.tripadvisor.com/Hotel_Review-g60864-d1203913-Reviews-Siegel_Select_New_OrleansNew_Orleans_Louisiana.html
[62] https://www.tripadvisor.com/Hotel_Review-g35322-d86893-Reviews-Motel_6_Atlanta_Tucker_NortheastTucker_Georgia.html

31

e. They were, by their acts and omissions, facilitating sex trafficking at G6 branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

63. Despite the continually mounting evidence that sex trafficking at G6 branded properties was ongoing and growing, G6 did not change course. G6 chose to continue earning revenue and profits from renting out space in their hotels as a venue for trafficking.

96. Ultimately, several hundred traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of G6 Branded properties.

97. Upon information and belief, each Defendant monitored criminal activity occurring at G6 Branded hotels and thus was aware of these incidents and many similar incidents at G6 properties around the country.

98. Upon information and belief, upper-level executives of the G6 Brand Defendants monitored news stories and law-enforcement reports regarding criminal activity at G6 Branded hotels. Upon information and belief, the public relations department for the G6 Brand Defendants would circulate communications discussing criminal activity, including human trafficking and prostitution, at G6 Branded properties.

99. This sampling of news stories, reviews, and other public information establishes that, at the time Plaintiff as trafficked at the subject properties, the G6 knew or should have known that:

a. There was widespread and ongoing sex trafficking occurring at G6 Branded properties.

b. Sex trafficking was a brand-wide problem for G6 originating from management level decisions at their corporate offices.

c. G6 franchisees and hotel staff were not taking reasonable steps to identify and

32

respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

d. G6's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.

e. G6 and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

100.    Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, G6 continued to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

## DEFENDANTS FACILITATED THE TRAFFICKING OF PLAINTIFF

101.    Each Defendant is a signatory of the Code[63] and thereby has promised to adopt these policies to combat trafficking. Yet, Defendants have failed to implement most, if not all these policies, and continue to unlawfully benefit from the trafficking on their properties.

102.    Defendant Wyndham is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

103.    Defendant G6 is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective

---

[63] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

Brand standards for implementation, mandates, and operations, but also enforced them.

104.    Defendants profited from the sex trafficking of Plaintiff Defendants rented rooms to and provided Wi-Fi to Plaintiff's traffickers when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where Plaintiff was trafficked. The hotel staff, especially front desk staff, at Defendants properties knew or should have known of the obvious signs of Plaintiff's trafficking.

105.    Defendants benefited from the steady stream of income that Plaintiff's traffickers and "johns" bring to their hotel brands. Defendants profited from each and every room that Plaintiff's traffickers and customers rented where Plaintiff was harbored and maintained for the purpose of sex trafficking. In addition, Defendants profited from data collected each and every time A.A.'s traffickers and customers used Defendants' Wi-Fi to advertise and solicit Plaintiff for commercial sex.

106.    Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of the benefits they were receiving from the human trafficking occurring at the locations where Plaintiff was trafficked given Defendants access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

107.    Moreover, Defendants repeatedly collected data on Plaintiff, her traffickers, and her "johns" from her many stays at Defendants hotels, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendant's employees witnessed the obvious signs of Plaintiff's trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the

trash, loud yelling and fighting, and others. Despite having access to all this information for years, Defendants failed to take reasonable measures to stop benefitting from sex trafficking occurring in their hotels. If Defendants had taken proper measures, Defendants would not have profited from Plaintiff and other victims like her being trafficked at their locations.

108. Defendants discussed, developed, and implemented uniform policies and procedures to identify, and mitigate the risk of human trafficking occurring at their properties, including the hotels where Plaintiff was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

109. Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the properties where Plaintiff was trafficked and reported this to Defendants or would have if Defendants did not fail to institute reasonable policies and procedures.

110. In addition, Defendants had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

111. Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on

their properties. Defendants maintained their deficiencies to maximize profits by:

a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d. Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e. Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f. Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

112. As a direct and proximate result of these egregious practices on the part of the Defendants, Plaintiff and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## DEFENDANTS' CONTROL OVER THEIR BRAND HOTELS

113.     Upon information and belief, it is a standard practice in the hospitality industry, followed by Defendants, for Parent Hotel Corporations to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

114.     Defendants provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand.  The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

115.      Defendants provide their branded properties branded name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online travel agency databases, as well as hotel locations with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites.  Thus, booking and room reservations are to a large extent controlled by the Hotel Defendants.  Defendants see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.[64]

116.     Upon information and belief, Defendants require its branded hotel properties to use a property management system, which is linked to Defendants' corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

---

[64] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

117.    Upon information and belief, per the relevant franchise agreements,[65] Defendants may enforce their brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

118.    Upon information and belief, the Hotel Defendants' brand standards are so strict as to bar entirely certain efforts to combat trafficking, for instance by prohibiting the prominent placement of informational signs within hotel rooms offering to help victims escape.

119.    It is further a standard practice in the hospitality industry, upon information and belief, followed by all Hotel Defendants, for parent companies to exercise significant control over the employment decisions of their hotel locations.

120.    The Hotel Defendants and their hotel locations exhibit a significant degree of interrelated, intermingled, and unified operations at the locations at which Plaintiff was trafficked. Upon information and belief, the Hotel Defendants promulgate policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions made at the individual hotel locations at which Plaintiff was trafficked.

121.    On information and belief, the Hotel Defendants utilize some of these funds to monitor the brand standards and to offer training to hotel operators and franchisees.

122.    Under federal labor regulations, the Hotel Defendants are each considered joint employers of the employees at their locations at which Plaintiff was trafficked and are subject to joint employer liability.

123.    As seen by citations herein to Defendants' websites, each shares or co-determines

---

[65] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

those matters governing the essential terms and conditions of employment, each Defendant sets the essential terms and conditions of employment, including hiring, training, retention, advancement of staff, and setting rates of pay. In particular, Defendants promulgated policies, procedures, and standards governing the hiring, training, retention and advancement of hotel staff, including setting rates of pay.

124. Of particular importance, the Hotel Defendants create and promulgate policies relating to training employees to recognize and respond to human trafficking, and the Hotel Defendants determine whether such training shall be mandatory.

125. Despite their knowledge that few, if any, employees at their hotel locations actually receive trainings if the same are not mandated, the Hotel Defendants have failed to mandate such training on any significant scale or at the specific locations where Plaintiff was trafficked.

126. On information and belief, the Hotel Defendants require their hotel locations to pay approximately 10% of gross revenue back to the Hotel Defendants for the privilege of using the Hotel Defendants' names and following their brand standards.

127. The stringent control and standardization of operations across Defendants' branded properties, including mandatory use of specific reservation and payment systems, not only streamline corporate oversight but also optimize revenue streams. These systems, while ostensibly for operational efficiency, also inadvertently facilitated the booking processes used by traffickers, thereby increasing room occupancy rates and directly benefiting Defendants financially.

## WYNDHAM

128. Wyndham exercises day-to-day control over Romulus La Quinta, and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Wyndham implements and retains brand hotel control over, including control over the Romulus

39

La Quinta where L.M. was trafficked, as either direct subsidiaries or under the terms of its franchise agreements.

129.    Upon information and belief, Wyndham controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a.  Requiring the branded locations to use Wyndham's property management system;

    b.  Requiring branded locations to keep audit reports and other records;

    c.  Conducting regular inspections, quality assurance evaluation reports, and audits for compliance with franchise agreement terms and Wyndham's corporate policies;

    d.  Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Wyndham's centralized systems;

    e.  Requiring the brands to regularly report data regarding customer feedback to Wyndham;

    f.  Providing marketing requirements and standardized marketing services for the branded locations;

    g.  Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

    h.  Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access, security, filtering;

    i.  Providing training and orientation materials for branded property staff;

    j.  Requiring branded locations to make modifications to the branded properties

upon Wyndham's request and to refrain from make substantial changes to the branded property without Wyndham's permission;

k.  Requiring branded properties to comply with Wyndham's Human Rights Policy and other laws;

l.  Regulating the rates for room rentals; and

m.  Insurance coverage requirements.[66]

130.    Wyndham manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Wyndham.[67]

131.    Wyndham controls uniform and required reservation, marketing, customer support systems and royalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Wyndham's website, and mentions across its corporate media channels.[68]

132.    Through its national sales team, Wyndham controls the credit processing system and the centralized direct billing at its brand hotels, including the Romulus Wyndham Branded Properties where L.M. was trafficked.[69]

133.    Wyndham mandates branded properties source through Wyndham's global

---

[66] *See e.g.* 2014 Franchise Disclosure Document https://fddexchange.com/wp-content/uploads/2014/03/Days-Inn-Franchise-Disclosure-Document-FDD-July-12-2012.pdf

[67] *Our Brands*, WYNDHAM HOTELS, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited Jun. 15 2022).

[68] *Benefits of Partnering with Wyndham Hotels & Resorts,* WYNDHAM HOTELS, CHOICE, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 15, 2022).

[69] *Id.*

distribution system.[70] Wyndham mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Romulus Wyndham Branded Properties where L.M. was trafficked.[71]

134. Wyndham regulates property rate, inventory availability, and overall revenue management for the branded locations by monitoring hotel booking data for trends and patterns.[72]

135. Wyndham manages its branded properties through its Oracle Hospitality OPERA Cloud Property Management System.[73] Wyndham's Development and Sourcing teams negotiate contracts on behalf of brands for hotel infrastructure, operating supplies and equipment and food and beverage.[74]

136. Wyndham sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Romulus Wyndham Branded Properties where L.M. was trafficked.[75]

137. Wyndham is the employer of the staff at its branded properties. For example, Wyndham posts all hotel jobs on its parent website.[76] Wyndham is also responsible for setting the core values and culture for all Wyndham employees.[77] In addition, Wyndham sets forth policies

---

[70] *Benefits of Partnering with Wyndham,* WYNDHAM, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 20, 2022).

[71] *See e.g., id* ("[Our goal is to ensure the design and construction of your hotel is as seamless as possible, guided by the appropriate brand standards.")

[72] Id.

[73] *Wyndham Implements Oracle Hospitality OPERA Cloud Property Management in its Full-Service Hotels,* HOTEL TECHNOLOGY NEWS (May 18, 2021), https://hoteltechnologynews.com/2021/05/wyndham-implements-oracle-hospitality-opera-cloud-property-management-in-its-full-service-hotels/

[74] *Supra* n 103

[75] *Leveraging technology to deliver an exceptional guest experience,* WYNDHAM (Summer 2021) 4, https://developmentsupport.wyndham.com/files/8516/2869/4484/Tech-Guide-Q3-2021.pdf

[76] *Join the Wyndham Family,* WYNDHAM, https://careers.wyndhamhotels.com/ (last visited Jun. 22, 2022)

[77] *About Wyndham,* WYNDHAM, https://careers.wyndhamhotels.com/content/About-Wyndham/#culture (last visited

for, and provides employee benefits.[78]

138.     Wyndham first adopted a Human Rights Statement in 2007. According to the updated 2018 policy, Wyndham promises to comply with human rights laws and standards and has "accountability mechanisms" in place to monitor and report on compliance. Brand locations are required to comply with human rights and "operating standards." Failure to comply can result in the termination of the franchise agreement.[79]

**G6**

136.     G6 exercises day-to-day control over the Motel 6 and its other brand hotels through centralized corporate systems, training, policies, and brand standards. G6 implements and retains brand hotel control over, including control over the Motel 6, as either direct subsidiaries or under the terms of its franchise agreements.

137.     Upon information and belief, G6 controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

      a   Requiring the branded locations to use G6's centralized property management, data management, and reservation and billing systems;

      b.   Gathering reports of data generated by branded locations including guest information, reservation, payment, and occupancy information through G6's centralized systems;

---

Jun 22, 2022)

[78] *Our Benefits,* WYNDHAM, https://careers.wyndhamhotels.com/content/Our-Benefits/?locale=en_US (last visited Jun 22, 2022)

[79] *Human Rights Statement*, http://q4live.s22.clientfiles.s3-website-us-east-1.amazonaws.com/153757806/files/doc_downloads/governance_documents/Wyndham-Hotel-Resorts-Human-Rights-Policy-Statement.pdf (last visited Jun. 15, 2022).

c. Conducting regular quality assurance inspections and audits for compliance with franchise agreement terms and G6's rules and regulations;

d. Requiring brands to purchase products through G6's e-procurement marketplace system or from approved suppliers;

e. Requiring branded properties to pay fees based off the percentage of gross room revenues;

f. Providing advertising requirements and standardized marketing services for the branded locations;

g. Requiring branded hotels to use approved vendors for internet services or other requirements for cybersecurity and technology;

h. Requiring all fixtures, furnishings, equipment, signs, services, materials, and supplies to meet G6's strict standards and specifications;

i. Regulating employment policies at branded location including training and orientation materials for staff;

j. Requiring branded locations to make modifications to the branded properties upon G6's request and to refrain from make substantial changes to the branded property without G6's permission;

k. Regulating the rates for room rentals; and

l. Insurance coverage requirements.[80]

138. G6 jointly employs all staff located at the Motel 6 by G6 where Plaintiff was trafficked. G6 shares or co-determines those matters governing the essential terms and conditions

---

[80] *See e.g.* 2017 Motel 6 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/motel-6-2017fdd-summary/motel-6-2017-fdd/

of employment. In particular, Defendants promulgated policies, procedures, standards governing the hiring, training, retention and advancement of hotel staff, including setting rates of pay.

139. G6 manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by G6.

140. G6 controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on G6's website, and mentions across its corporate media channels.[81]

141. G6 requires branded properties to use a centralized, cloud-based reservation and property management system.[82]

142. G6 gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[83]

143. G6 requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives G6 the ability to access, monitor, and harvest that internet data.[84]

---

[81] G6 offers a centralized reservations system on its website, a customer support channel, and press releases and announcements about the Motel 6 brand through g6hospitality.com; G6 also offers a reward program specific to the Motel 6 brand. *See Join My6,* MOTEL 6, https://www.motel6.com/en/home/my6/join.html

[82] *See* Michal Christine Escobar, *2020 Enterprise Innovator: Motel 6,* HOSPITALITY TECHNOLOGY, https://hospitalitytech.com/2020-enterprise-innovator-motel-6

[83] G6 Hospitality. *Privacy Policy,* https://www.motel6.com/en/home/policies/privacy-policy.html

[84] Motel 6, *Web and Mobile Ethical Vulnerability Disclosure Policy,*
https://www.motel6.com/en/home/policies/vulnerability-disclosure.html

144. G6 requires branded properties to comply with its corporate policies relating to Safety and Security, Codes of Conduct, Ethics, Economic, Social, Governance, and compliance with the law.[85]

## TOLLING OF LIMITATIONS

138. To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes 18 U.S.C. § 2255, which extends the statute of limitations for L.M.'s claims indefinitely.

139. Alternatively, Plaintiff invokes the discovery rule. At the time she was harmed and through at least 2014, Plaintiff was under the coercion and control of traffickers who drugged her, threatened her, psychologically abused her, exercised coercive control over her, and severely restricted her freedom. As a result, Plaintiff lacked the information and capacity to understand her injuries and their legal causes.

146. Thus, Plaintiff did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her traffickers, Plaintiff —through no fault of her own—lacked the information and understanding to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of Plaintiff being kept under the control, coercion, and manipulation of her traffickers, which Defendants facilitated.

147. At the time Plaintiff was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being "trafficked" at Defendants' hotels or that she was a person "trafficked", much less that she was the "victim" of a legal venture involving defendants, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

148. To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking,

---

[85] *Combatting Human Trafficking,* G6 HOSPITALITY, https://g6hospitality.com/about-us/combating-human-

Plaintiff faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Plaintiff filed this lawsuit.

149. While under the control of her traffickers, Plaintiff did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. L.M. could not have pursued her claims while under the active control of her traffickers despite the exercise of ordinary diligence.

150. To the extent Defendants assert an affirmative defense of limitations, Plaintiff also invokes the continuing violation doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, across the subject locations.

152. This continuous trafficking resulted from Defendants' facilitation of trafficking at the subject Defendants' Hotels and Defendants' ongoing ventures with one another and with criminal traffickers at those Hotels.

## CAUSES OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA")
### (AGAINST ALL DEFENDANTS)

145. Plaintiff incorporates each foregoing allegation.

146. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

147. Defendants are liable as perpetrators within the meaning of 18 U.S.C. § 1595(a) because in the ways described above, each Defendant knowingly or recklessly participated in harboring, maintenance, and/or other acts in further of sex trafficking, including the sex trafficking of Plaintiff and each Defendants knowingly benefitted, by receiving financial and other

compensation, through their participation in a venture that they knew or were reckless in not knowing involved the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

148. Furthermore, Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her traffickers for the purposes of commercial sex induced by force, fraud, or coercion.

149. Defendants have continued to benefit as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion, they received payment for rooms or kickbacks from internet usage, contributing to their direct financial benefit from the sex trafficking of Plaintiff when they knew or should have known that violations of §1591(a) were occurring.

150. Despite knowledge of Plaintiff's sex trafficking by Defendants, Plaintiff's traffickers were able to continue renting rooms for the sexual exploitation of Plaintiff

151. Each Defendant participated in a venture together and with, among others, Plaintiff's traffickers. Defendants had an ongoing business relationship and association in fact with Plaintiff 's traffickers. Despite knowing or having reason to know that Plaintiff was being sex trafficked in violation of the TVPRA, Defendants continued to rent rooms to her traffickers,

providing a secure venue for Plaintiff's sexual exploitation. Plaintiff's sex traffickers used Defendant's Hotels because they knew that staff members looked the other way despite obvious signs of trafficking. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits. Each Defendant profited while Plaintiff's trafficker was able to rent a secure venue to earn profits by trafficking Plaintiff. Each Defendant participated in the venture by continually renting rooms to Plaintiff's trafficker, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of Plaintiff's trafficking.

152. Each Defendant's failure to train and supervise their agents and employees, as well as their disregard for the welfare of their guests, including Plaintiff, enabled and contributed to her sex trafficking.

153. The facts alleged establish that each Defendant knowingly benefitted, financially or by receiving anything of value, from participating in a venture that Defendants knew or should have known has engaged in an act in violation of the TVPRA.

154. Plaintiff further alleges that, as a result of the relationship between Defendants and their branded properties, Defendants are vicariously liable for the acts of their branded properties, including at the subject property. Defendants and their branded properties jointly controlled the terms and conditions of employment for staff, making them joint employers. Factors that support this allegation include shared profits, standardized employee training, strict rules of operation, control over pricing and reservations, regular inspections, operational support, and Defendants' right to terminate franchise agreements with their branded properties, including the subject property, for failing to comply with these requirements. Therefore, Defendants retained control, or the right to control, the mode and manner of work contracted for, making them responsible for the

acts and omissions of staff and branded properties.

155.    Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels and properties. The actions, omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages, therefore Defendants are jointly and severally liable.

## COUNT 2: 18 U.S.C. § 2255(A) CHILD ABUSE VICTIMS RIGHTS ACT ("CAVRA") (AGAINST ALL DEFENDANTS)

156.    Plaintiff incorporates each forgoing allegation.

157.    Plaintiff was a "minor" pursuant to 18 U.S.C. § 2255(a) when she was trafficked.

158.    Plaintiff was the "victim" of violations of 18 U.S.C. §§ 1589, 1590, and 1591.

159.    Plaintiff suffered "personal injury" pursuant to 18 U.S.C. § 2255(a) as a result of those violations.

160.    Plaintiff was a "person" who "has not attained the age of 18 years" pursuant to 18 U.S.C. § 1591(a)(2).

161.    Pursuant to 18 U.S.C. § 2255(a), Plaintiff is entitled to a civil remedy for minors who are victims of violations of Chapter 110 of Title 18, including sexual exploitation and trafficking.

162.    Defendants knew or should have known that means of force, threats of force, fraud, coercion, or any combination of those means would be used to cause Plaintiff to engage in a commercial sex act, pursuant to 18 U.S.C. § 1591(a)(2). As a minor, there is a legal presumption that any commercial sex act involving Plaintiff was induced by force, fraud, or coercion, as minors cannot legally consent to such acts.

163.    Defendants knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff, pursuant to 18 U.S.C.

50

1591(a)(1), by providing her and her traffickers rooms in hotels and Wi-Fi that may have been used advertise Plaintiff and solicit customers affecting interstate commerce where authorities were unlikely to discover the injuries being sustained by Plaintiff.

164.    Defendants knowingly benefited, financially or by receiving anything of value, from participation in ventures of renting rooms and providing Wi-Fi that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff to engage in commercial sex acts.

165.    Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.    Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.    Disgorgement of profits obtained through unjust enrichment;

c.    Restitution;

d.    Statutory and/or treble damages, where available;

e.    Punitive damages;

f.    Attorneys' fees and expenses;

g.    The costs of this action;

h.    Pre- and post-judgment interest; and

i.      Any other relief the Court or jury deems appropriate.

## **JURY DEMAND**

Plaintiff hereby demands a trial by struck jury.

Dated: November 15, 2024

Respectfully submitted,

*/s/ Penny L. Barrick*
Penny L. Barrick (0074110)
Steven C. Babin, Jr. (0093584)
Babin Law, LLC
10 West Broad Street, Suite 900
Columbus, Ohio 43215
T: 614-761-8800
E: penny.barrick@babinlaws.com /
steven.babin@babinlaws.com

52